**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| LESLIE JEFFERSON, as Next Friend of C.J., a minor, and ANDREW WHITE, as Next Friend of S.W., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> Waxahachie Independent School District Board of Trustees, DUSTY AUTREY, KIM KRIEGEL, DEBBIE TIMMERMANN, RYAN PITTS, ADRIAN COOPER, JUDD MCCUTCHEN, and CLAY SCHOOLFIELD, in their official capacities; KARINA WHITE, individually, TONYA HARRIS, individually and ANTHONY ESCOTO, individually, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> ***JURY TRIAL DEMANDED*** |

NOW COME Plaintiffs, LESLIE JEFFERSON, as Next Friend of C.J., a minor, and ANDREW WHITE, as Next Friend of S.W., a minor ("PLAINTIFFS"), by and through their attorneys, LAUX LAW GROUP and EVANS/REILLEY, and for their cause of action against Defendants, DUSTY AUTREY, KIM KRIEGEL, DEBBIE TIMMERMANN, RYAN PITTS, ADRIAN COOPER, JUDD MCCUTCHEN, CLAY SCHOOLFIELD, KARINA WHITE, TONYA HARRIS and ANTHONY ESCOTO ("DEFENDANTS"), state as follows:

## INTRODUCTION

This is a civil rights action brought pursuant to 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964, as amended), 42 U.S.C. § 1983 and pursuant to the Fourteenth Amendment to the United States Constitution, in order to recover damages against DEFENDANTS for the

deprivation of civil rights suffered by PLAINTIFFS' minor daughters, S.W. and C.J., and the discriminatory treatment to which they were subjected, on account of their race.

This is also an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to declare the rights and other legal relations between the parties. PLAINTIFFS are also seeking equitable relief and injunctive relief to prevent the DEFENDANTS from committing further acts of discrimination suffered by C.J. and S.W., as well as by other African American and Latino students in the Waxahachie Independent School District (WISD).

## JURISDICTION

1.      Jurisdiction and venue of this Court are invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1391, 42 U.S.C. § 2000d and the Fourteenth Amendment to the U.S. Constitution.  The unconstitutional practices alleged to have been committed against PLAINTIFFS were committed in the State of Texas, and in Ellis County, Texas.

## PARTIES

2.      At all relevant times, Plaintiff, LESLIE JEFFERSON (hereafter "PLAINTIFF JEFFERSON"), resided in Ellis County, Texas.  PLAINTIFF JEFFERSON is the biological mother of C.J., a minor.

3.      C.J., a minor, is an African American student who completed tenth grade at the close of the 2023-24 school year.  At all relevant times, C.J. was a student of Waxahachie High School (WHS), which is located in Ellis County, Texas.

4.      At all relevant times, Plaintiff, ANDREW WHITE (hereafter "PLAINTIFF WHITE"), resided in Ellis County, Texas. PLAINTIFF WHITE is the biological father of S.W., a minor.

5.      S.W., a minor, is a Latino student who completed seventh grade at the close of the 2023-24 school year.  At all relevant times, S.W. was a student of Howard Jr. High School (HJHS), which is located within Ellis County, Texas.

6.      DUSTY AUTREY, KIM KRIEGEL, DEBBIE TIMMERMANN, RYAN PITTS, ADRIAN COOPER, JUDD MCCUTCHEN and CLAY SCHOOLFIELD are all members of the WISD Board of Trustees (collectively, "DEFENDANT TRUSTEES") and are sued in their official capacity.  DEFENDANT TRUSTEES are responsible for overseeing the management of the district and ensuring that the WISD superintendent implements and monitors plans, procedures, programs, and systems to achieve appropriate, clearly defined, and desired results in the major areas of district operations, including adopting policies and procedures concerning bullying that prohibit the bullying of a student and prevent bullying incidents.

7.      DEFENDANTS are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983, 42 U.S.C. § 2000d and the Fourteenth Amendment.

8.      WISD, a public school district in the State of Texas, is a government agency responsible for providing school children with full and equal access to the public education programs and activities it offers in compliance with the requirements of the U.S. Constitution, federal laws and state laws. WISD is chartered and incorporated under Texas law and is a recipient of federal financial assistance. WISD's responsibilities include making and implementing educational decisions for the schools within its jurisdiction.

9.      Defendant, KARINA WHITE (hereafter "DEFENDANT WHITE"), was at all times relevant hereto a resident of the State of Texas working in Ellis County, and was acting under the color of state law in her capacity as a supervisory junior high school administrator and assistant principal.

10.     Defendant, TONYA HARRIS (hereafter "DEFENDANT HARRIS"), was at all times relevant hereto a resident of the State of Texas working in Ellis County, and was acting under the color of state law in her capacity as a supervisory high school administrator and campus principal.

11.     Defendant, ANTHONY ESCOTO (hereinafter "DEFENDANT ESCOTO"), was at all times relevant hereto a resident of the State of Texas working in Ellis County, and was acting under the color of state law in his capacity as a supervisory high school administrator and vice principal.

### WISD POLICIES ON SCHOOL BULLYING, DISCIPLINARY MEASURES AND DISCIPLINARY ALTERNATIVE EDUCATION PROGRAMS

12.     WISD is a Title I district, located 26 miles south of Dallas, Texas.  According to the Texas Education Agency (TEA)[1], the WISD was comprised of 11,621 students in 2022-23. See TEA WISD Discipline Statistics 2022-23, attached as Exhibit 1.  Upon information and belief, at all relevant times, WISD accommodated its students at seventeen (17) at campuses, including ten (10) elementary schools, three (3) junior high schools, three (3) high schools and one (1) alternative learning school.[2]

13.     In 2022-2023, WISD student population was 38.89% Latino (Hispanic), 38.66% White, 17.30% Black African American and 5.14% comprising of Two or More races, Asian, American Indian-Alaskan Native and Native Hawaiian-Pacific Islander.[3]

---

[1] The Texas Education Agency (TEA) is the state agency that oversees primary and secondary public education in the State of Texas, where it helps deliver education to more than 5 million students.  Among other its many important functions, the TEA administers a data collection system on public school information.  See tea.texas.gov/about-tea/welcome-and-overview
[2] See Waxahachie Independent School District (WISD) 2023-24 Improvement Plan at p. 4.
[3] Id.

14.     At all relevant times, WISD schools, including WHS and HJHS, were subject to the rules and regulations contained in the Texas Education Code (TEC). WISD schools, including WHS and HJHS, had a duty to uphold and abide by the WISD Student Code of Conduct (hereafter "Student Code").

<u>Bullying and Cyberbullying are Prohibited in Texas Schools</u>

15.     The right to education is an important right, and minority students have the right to equal protection with respect to obtaining education.  See *Brown v. Board of Education*, 347 U.S. 483 (1957).  Bullying is prohibited in Texas schools.  An institutional tolerance of bullying and/or a pattern of selective discipline in bullying incidents disrupt that important right.

16.     Bullying is defined in the State of Texas as a single significant act or a pattern of acts by one or more students directed at another student that exploits an imbalance of power and involves engaging in written or verbal expression, expression through electronic means, or physical conduct that:

- has the effect or will have the effect of physically harming a student, damaging a student's property, or placing a student in reasonable fear of harm to the student's person or of damage to the student's property;

- is sufficiently severe, persistent, or pervasive enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student;

- materially and substantially disrupts the educational process or the orderly operation of a classroom or school; or

- infringes on the rights of the victim at school.[4]

---

[4] See Texas Education Code (TEC) § 37.0832.

17.     In Texas, bullying expressly includes cyberbullying.[5]  Cyberbullying is defined as bullying that is done through the use of any electronic communication device, including cell phones, social media or any internet-based communication tool.[6]

18.     At all relevant times, DEFENDANTS were required to provide students with a learning environment that is free from bullying.  WISD schools are prohibited from retaliating against a person who: (a) reports bullying or cyberbullying; (b) provides information during an investigation of bullying or cyber-bullying; or (c) witnesses or has reliable information about bullying or cyberbullying. It is the responsibility of every WISD employee to recognize acts of bullying, cyber-bullying and retaliation.

19.     Moreover, at all relevant times, DEFENDANTS were required by law to provide age-appropriate instruction on bullying prevention and provide professional development to build the skills of staff members.

<u>Targeted Students Engaged in Acts of Self-Defense During Bullying Incidents
Should Not be Disciplined</u>

20.     In Texas, at all relevant times, there existed statutory safeguards from discipline for students who attempt to fight back when targeted by a bully.  For instance, Texas school districts—including WISD—are prohibited from imposing discipline on a student who engaged in reasonable self-defense in a bullying incident.[7]  Self-defense includes the use of force used against another person when the force is reasonably believed to prevent further harm or protect oneself from further harm.

---

[5] See TEC § 37.0832(a)(1)(B)
[6] See TEC § 37.0832(a)(2)
[7] See TEC § 37.0832(a)(2)(C)(8).

21.     Therefore, at all relevant times, DEFENDANTS were charged with investigating bullying complaints and also required to review any actions taken by the targeted student during the bullying incident to determine if such actions would constitute reasonable self-defense against the student who engaged in bullying. If the actions of the targeted student are determined to be reasonable self-defense, then no disciplinary action can be taken against that student.[8]

22.     At all relevant times, DEFENDANT TRUSTEES were required to adopt policies and procedures concerning bullying that prohibit the imposition of a disciplinary measure on a student who, after an investigation, is found to be a victim of bullying, on the basis of that student's use of reasonable self-defense in response to the bullying.

<u>School-based Stay Away Agreements or Directives</u>

23.     In Texas, a school-based stay away agreement is a binding written agreement or directive whereby an offending student is required to stay away from a student he or she has targeted with bullying or other unwanted conduct. The intent of a stay away agreement is to increase safety for targeted students.[9] See Image No. 1 below.

---

[8] See TEC § 37.0832(c)(8).
[9] See Pflugerville (Texas) Independent School District school-based stay away agreement, attached hereto as Exhibit 2, at p. 1.

**Image No. 1: Texas School-based Stay Away Agreement Exemplar**

24.     Stay away agreements are to be administered by the school principal or designee in a conference with the offending student and his or her parent.  See Ex. 2.

25.     In Texas, school-based stay away agreements direct an offending student to stay away from the targeted student at all times during the applicable time period as described in the agreement.  See Ex. 2.  Stay away agreements provide offending students notice by containing the express restrictions imposed on them (e.g., "you may not approach, talk to, sit by or have any contact with (name of targeted student) at school or on school property…").  See Ex. 2.

26.     In Texas, school-based stay away agreements identify the name of the offending student and also advise him or her that any violations of the agreement will result in further

disciplinary actions.[10]  Stay away agreements are signed by the offending student and his or her parent.[11]

<u>Disciplinary Alternative Education Programs, a Form of School Exclusion</u>

27.     At all relevant times, Texas public school districts were required to provide disciplinary alternative education programs (DAEPs) which serve as alternative education setting for students temporarily removed for disciplinary purposes from their regular instructional settings (i.e. their assigned classrooms and schools).[12]

28.     A purported purpose of DAEP assignment—which may be mandatory or discretionary—is to provide temporary student placement for behavior management as an alternative to suspension or expulsion.[13]  A purported goal of DAEP is for removed students to return to, and succeed in, their regularly assigned classrooms and schools.[14]

29.     DAEP is a serious and indelible form of discipline insofar as DAEP removal can stigmatize students as problem students or misfits. Assignment to DAEP can also serve to bar these students from participating in certain extra-curricular activities.

30.     DAEP is a "school exclusion" form of student discipline, meaning students assigned to DAEP are physically removed from their schools and excluded from the learning and studies transpiring in their classrooms.

---

[10] Id.

[11] Id.

[12] See Disciplinary Alternative Education Program Practices: Policy Research Report No. 17, August 2007, at p. 1; Division of Accountability Research, Department of Assessment, Accountability, and Data Quality; Texas Education Agency.

[13] https://texasappleseed.org/sites/default/files/SchoolDisciplineinTexas-new.pdf

[14] Id.

31.    According to non-for-profit Texas Appleseed[15]:

> School exclusions can be harmful for students. When students miss time with their regular teachers and peers, they may fall behind academically and important social development opportunities may be negatively affected. Students may start to disengage from school and lose trust in the adults on their campus. Research shows that even one suspension can increase the likelihood that students will be held back, will not graduate on time, and will have future contact with the justice system.

> Exclusionary school discipline often has a disproportionate impact on students of color and students with disabilities. Greater use of exclusionary school punishments does not help to improve student behavior either among the students being punished or among the general school population.[16]

32.    Mandatory DAEP assignments result from conduct specified in TEC Chapter 37. A student *must be placed* in a DAEP if the student engages in any number of felonies or serious crime at a public school or on school property. The conduct requiring mandatory DAEP assignment is well-defined, and when a student engages in one of the serious acts described, WISD employees have no discretion regarding DAEP removal—the offending student must be removed from school.

33.    Discretionary DAEP assignments are determined by each district.  At all relevant times, discretionary DAEP assignments result from alleged violations of the Student Code.[17]

34.    Per the Student Code, a WISD student *may be placed* in a DAEP for any one of the following inexhaustive offenses:

- engaging in bullying that encourages a student to commit or attempt to commit suicide;

- inciting violence against a student through group bullying;

---

[15] https://texasappleseed.org/sites/default/files/SchoolDisciplineinTexas-new.pdf
[16] See Kupchik, Aaron, *The Real School Safety Problem: The Long-term Consequences of Harsh School Punishment* (2016) pp. 23-27.
[17] Id. at p. 3.

*****

- assault (no bodily injury) with threat of imminent bodily injury; and

- assault by offensive or provocative physical contact.

35.     According to the Student Code, WISD staff and/or the campus behavior coordinator must consider certain factors when determining the appropriateness of DAEP placement, including:

- self-defense;

- intent or lack of intent at the time the student engaged in the conduct;

- the student's disciplinary history; and

- a disability that substantially impairs the student's capacity to appreciate the wrongfulness of the student's conduct.

36.     Historically and currently, Texas school districts have wide discretion in determining the behaviors that allow DAEP assignment. In 2017-18, the vast majority of punishments in Texas schools—approximately 87%—were "discretionary" for violations of a school district's Student Code of Conduct and not for more serious offenses that require punishment under the law.[18]

<u>DAEP Appeal Process at WISD</u>

37.     A WISD student or parent is allowed to appeal the student's placement in DAEP up to three (3) times—Levels I, II and III.  However, DEFENDANTS do not delay or defer disciplinary consequences pending the outcome of an appeal.[19]

---

[18]    https://www.texasappleseed.org/texas-state-school-discipline-look-data (DAEP Actions by Race/Ethnicity (2017-18) from Texas Appleseed Publication: *Texas: The State of School Discipline, A Look at the Data 2017-18).*
[19] See WISD 2023-24 Student Code of Conduct, at p. 22.

38.     Level I complaint forms must be filed within fifteen (15) days of the date of the challenged disciplinary decision, and a conference must be held with the student or parent within ten (10) days of the filed complaint. The school administrator is required to provide a written decision within ten (10) days of the conference. If the student or parent did not receive the relief requested, the decision may be appealed at Level II.

39.     Level II appeal notice must be filed in writing within ten (10) days of the date of the Level I decision.  The student or parent may request a copy of the Level I record, including, *inter alia*, all documents relied upon by the Level I administrator in reaching the Level I decision.

40.     The superintendent or designee is required to hold a Level II conference with the student or parent within ten (10) days of the date the appeal notice was filed. The superintendent or designee must then provide the student or parent with a written response setting forth the basis of the decision within ten (10) days following the conference. If the student or parent disagrees with the decision, it may be appealed at Level III.

41.      Level III appeal notice must be filed in writing within ten (10) days of the date of the Level II decision. The student or parent may request a copy of the Level II record.  Level III appeals are heard by the school board, and there is no time constraint on when the board decides to hear the complaint. After the school board has heard and considered the complaint, it may give notice of its decision no later than the conclusion of the next regularly scheduled board meeting.

42.     Assuming the appealing student or parent challenges the DAEP placement the same day it was assigned, challenges the Level I decision the same day it was rendered and also challenges the Level II decision the same day it was rendered, the quickest that student or parent might even reach Level III is about forty-one (41) days.  Therefore, the appeal process at WISD

is configured to frustrate successful challenges of discretionary DAEP assignments of thirty (30) days or less.

## FACTS PERTAINING TO PLAINTIFFS' MINORS

## C.J. EXPERIENCES BULLYING, CYBERBULLYING AND DISCRIMINATORY TREATMENT

43.     During the 2023-24 Fall semester, C.J. was fifteen (15) years of age and a sophomore at WHS.

### A White Female Classmate's First Reported and Documented Bullying of C.J.

44.     On Monday, September 18, 2023, around lunch time, C.J. was seated at a lunch table in the WHS cafeteria, minding her own business, when she was approached by a White female classmate (hereafter "WF1") who told her to get up and leave the table because WF1 and her friends wanted the table.  WF1 continued to intimidate and harass C.J., demanding that she leave.  However, C.J. stayed and WF1 left.

45.     WF1's September 18 interaction with C.J.—wherein she referenced her group's entitlement to the lunch table where C.J. sat—constitutes bullying per TEC § 37.0832 because it was "a single significant act or…by one…student[] directed at another student that exploit[ed] an imbalance of power and involve[d] engaging in…verbal expression…that…plac[es] a student in reasonable fear of harm to the student's person or of damage to the student's property."

46.     WF1's September 18 interaction with C.J. constitutes bullying per TEC § 37.0832 because it was "sufficiently severe…enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student."

47.     WF1's September 18 interaction with C.J., constitutes bullying per TEC § 37.0832 because it "infringes[d] on the rights of [C.J.] at school."

The White Female Classmate's Second Reported and Documented Bullying of C.J.

48.     Four days later, on Friday, September 22, 2023, again around lunchtime, again minding her own business, C.J. was seated at the same lunch table with another classmate when she was again approached by WF1.  WF1 again demanded that C.J. vacate the lunch table but C.J. stayed seated.

49.     WF1 then intentionally poured her beverage over C.J.'s head, on C.J.'s person and on the lunch table where C.J. sat.  This is a clear second act of bullying.

50.     In response, shocked, C.J. threw water at WF1 and tried to create distance between the two of them. Undaunted, WF1 then escalated the situation by punching C.J. in the face.  C.J. continued to defend herself, and a physical fight ensued.

51.     Despite being targeted by a bullying offending student, and despite clearly engaging in self-defense during a bullying incident, C.J. was put in-school suspension (ISS) for five (5) days pending a hearing on the matter.  Upon information and belief, WF1 was either not disciplined or received lesser discipline than C.J.

The White Female Classmate's Third Reported and Documented Bullying of C.J.

52.     WF1, upon information and belief, then engaged in an act of cyberbullying against C.J. four days later, on September 26, 2023 when she posted a social media message about C.J., writing: "*Whs girls be mad  Diego my man [heart emoji]  Quit taking up half them damn table for 3 of yall fat bitches.*" PLAINTIFF JEFFERSON promptly reported this instance of cyberbullying against C.J. to WHS staff, providing screenshots of the social media message.

53.     On September 26, 2023, ESCOTO held the hearing on the September 22 cafeteria incident which PLAINTIFF JEFFERSON attended in-person.  Rather than identify the cafeteria incident where WF1 verbally intimidated C.J. before pouring her beverage on C.J. as second

brazen act of bullying—or even a single bullying act—DEFENDANT ESCOTO instead determined that the incident was properly characterized as a "fight/mutual combat[20] in the cafeteria."

54.     On that date, based on his discretionary finding—that C.J. was not bullied but instead engaged in aggressive behavior equally culpable with WF1—ESCOTO punished C.J. with discretionary DAEP for 30 days. In response, PLAINTIFF JEFFERSON filed a Level I appeal of ESCOTO's decision on that same day.

<u>C.J.'s DAEP Appeal Process at WHS</u>

55.     On October 2, 2023—after C.J. had already completed the five (5) days of ISS she received from DEFENDANT ESCOTO—PLAINTIFF JEFFERSON's Level I appeal on behalf of C.J. was heard by DEFENDANT HARRIS.  At the hearing, DEFENDANT HARRIS told PLAINTIFF JEFFERSON that a claim of bullying against a student is a "strong accusation."

56.     DEFENDANT HARRIS then continued, stating that WF1's actions against C.J. in the cafeteria on September 22, 2023 were not bullying because "bullying is a series of events" and the term "bullying" cannot be applied to a single incident.

57.     In response to DEFENDANT HARRIS' misrepresentation, PLAINTIFF JEFFERSON explained to her that, per the express language of TEC § 37.0832, bullying can comprise of a single incident.  Moreover, notwithstanding the fact that bullying can occur as a single incident, PLAINTIFF JEFFERSON reminded DEFENDANT HARRIS that the September 22 cafeteria incident was not the first such incident but rather the second incident in the course of four (4) days during a school week.

---

[20] Fighting/mutual combat is defined as two or more students or persons that choose to mutually engage in physical combat using blows or force to strive to overcome the other student(s) or person(s).

58.     During the October 2 Level I hearing, PLAINTIFF JEFFERSON learned that even though there was a WHS internal video recording of the entire September 22 cafeteria incident, DEFENDANT HARRIS did not view the recording prior to the hearing.  During the hearing, PLAINTIFF JEFFERSON learned that DEFENDANT HARRIS never interviewed or even questioned C.J.'s classmate who sat in close proximity to C.J. during the entirety of the incident and who is even depicted in WHS' internal video recording.

59.     Later that day, on October 2, 2023, PLAINTIFF JEFFERSON told DEFENDANT HARRIS that C.J. was engaged in self-defense during a bullying incident.  Despite the requirement to consider such mitigating factors per the Student Code, DEFENDANT HARRIS upheld both C.J.'s ISS and the discretionary DAEP imposed.

60.     On October 3, 2023, C.J. began her 30-day DAEP punishment, reporting to a WISD facility miles away from her school.

61.     On October 11, 2023, DEFENDANT HARRIS heard PLAINTIFF JEFFERSON's Level I appeal on behalf of C.J., which DEFENDANT HARRIS denied.

62.     By the time DEFENDANT HARRIS decided to deny PLAINTIFF JEFFERSON's Level I appeal, C.J. had already served eight (8) days of the DAEP that was challenged via the Level I hearing.

63.     The following day, October 12, 2023, PLAINTIFF JEFFERSON filed a Level II appeal based on DEFENDANT HARRIS' denial of her Level I appeal.  In her appeal request, PLAINTIFF JEFFERSON explained the basis of both appeals, pleading that her "daughter was bullied and it is not being acknowledged."  She added that "cyberbullying [of C.J. was] reported and not acknowledged" despite DEFENDANT HARRIS being given "a picture of the social post" substantiating the cyberbullying.

64.     PLAINTIFF JEFFERSON told DEFENDANT HARRIS that "WISD is in violation of the bullying policy and has not protected [her] daughter." PLAINTIFF JEFFERSON voiced her serious concerns that C.J. "was bullied and assaulted and is being sent to DAEP." PLAINTIFF JEFFERSON complained to DEFENDANT HARRIS about C.J. being selectively disciplined.

65.     Eight (8) days later, on October 20, 2023, WISD Assistant Superintendent of Secondary Learning, David Averett, conducted a hearing on PLAINTIFF JEFFERSON's Level II appeal on behalf of C.J. The Level II hearing concluded without a decision or ruling on PLAINTIFF JEFFERSON's Level II appeal.

66.     By the time of the October 20 hearing on PLAINTIFF JEFFERSON's Level II appeal on behalf of C.J.—to be clear, not the actual Level II decision, but merely the hearing—C.J. had already served seventeen (17) days of the DAEP that was being challenged.

67.     On October 30, 2023, C.J. served her final day of DAEP, which was reduced to 25 days to account for the five (5) days she served ISS.

68.     On November 3, 2023, PLAINTIFF JEFFERSON's Level II appeal on behalf of C.J. was denied. WISD general counsel W. Lee Auvenshine advised PLAINTIFF JEFFERSON that "it was determined that [C.J.'s] claim of bullying was not substantiated in this case" and that "[t]here was no evidence that the events that led up to the fight were at a level of severity to rise to the level of bullying." Further, according to Auvenshine, there were ample opportunities for C.J. to avoid fighting by seeking adult intervention.

69.     PLAINTIFF JEFFERSON viewed WISD's internal video of the incident, and it clearly reflects that WF1 started the incident by pouring her drink on C.J. and initiated physical

17

contact by punching C.J. PLAINTIFF JEFFERSON requested a copy of the video but was denied by WISD.

70.    On November 13, 2024, C.J. returned to WHS.  However, as a result of her DAEP assignment, C.J. was barred from trying out for the WHS cheerleading team.

## S.W. EXPERIENCES BULLYING, CYBERBULLYING AND DISCRIMINATORY TREATMENT

71.    During the 2023-24 Fall semester, S.W. was twelve (12) years old and in sixth grade at HJHS.

### A White Female Classmate's Reported and Documented Bullying of S.W.

72.    On September 6, 2023, PLAINTIFF WHITE informed DEFENDANT WHITE that some WISD students, including a White Female Classmate (hereafter "WF2"), created and circulated a TikTok video in which the students call S.W. a "whore," among other things. The following day, September 7, DEFENDANT WHITE assured PLAINTIFF WHITE that she would investigate the allegations and gather more information on the matter.

73.    On September 12, 2023, PLAINTIFF WHITE again contacted DEFENDANT WHITE to advise that the students continued to post derogatory social messages about S.W.

74.    On September 15, 2023, DEFENDANT WHITE issued her report, finding that S.W. was bullied and finding that the students' conduct reported by PLAINTIFF WHITE on behalf of S.W. constituted "bullying" in violation of WISD policy.  DEFENDANT WHITE advised PLAINTIFF WHITE that the offending students "were disciplined in accordance with the WISD student code of conduct and other necessary precautions have been put into place."

75.    In her September 15 report, DEFENDANT WHITE stated that a "stay away directive" was imposed on "some of the students on our campus who were a part of the call but who were not active participants in the call."

76.     WF2 was one of the students listed on DEFENDANT WHITE's stay away directive, which required that she not make any contact with S.W.

77.     Nowhere within DEFENDANT WHITE's report is it expressed that S.W. was subject to any stay away agreement.

78.     At no time in September 2023 did DEFENDANT WHITE advise or mention that any type of a stay away agreement would be imposed upon S.W., the victim of the bullying DEFENDANT WHITE determined had occurred.

79.     At no time did S.W. or PLAINTIFF WHITE receive a copy of any stay away directive to which S.W. was subject.  At no time did PLAINTIFF WHITE attend any conference pertaining to a September 2023 stay away directive or sign any stay away agreement around that time.  DEFENDANT WHITE did not facilitate any counseling for S.W., despite the bullying she experienced.

<u>DEFENDANT WHITE Produces a Backdated Stay Away Directive and Then<br>Claims S.W. Violated the Backdated Stay Away Directive</u>

80.     On October 10, 2023, DEFENDANT WHITE contacted PLAINTIFF WHITE and advised him that S.W. violated the stay away directive she previously issued at the conclusion of her investigation into the bullying of S.W. the prior month.  According to DEFENDANT WHITE, S.W. put herself in the same area as some of the offending students from the cyberbullying incident during a school homecoming game on October 6, and this violated the stay away directive.

81.     DEFENDANT WHITE's representation that her stay away directive from the prior month included S.W. was a false representation.

82.     Moreover, this false representation notwithstanding, cell phone video from that evening reflects that it was actually WF2—who was subject to the stay away directive issued by

DEFENDANT WHITE—that aggressively approached and confronted S.W. who was otherwise minding her own business and not subject to any such directive.  See Image No. 2 below.



**Image No. 2: S.W. (green arrow) is confronted at the October 6 Homecoming Game by a white female classmate (red arrow) who DEFENDANT WHITE ordered not to contact S.W.**

83.    DEFENDANT WHITE told PLAINTIFF WHITE that S.W. would be disciplined with ISS for violating the September 2023 stay away directive put in place as a result of the investigation in which she concluded S.W. was bullied.

84.    PLAINTIFF WHITE responded that he was unaware of any stay away directive applying to S.W.  Further, PLAINTIFF WHITE explained to DEFENDANT WHITE that cell phone video footage supported S.W.'s account that she was simply watching the game and doing nothing provocative when she was aggressively approached and confronted by WF2.

85.    PLAINTIFF WHITE requested from DEFENDANT WHITE a copy of the stay away directive she claimed S.W. violated.

86.    The following day, October 11, 2023, upon information and belief, S.W. was taunted by WF2 during gym class at HJHS, and a physical altercation ensued.  Despite engaging in self-defense in response to bullying, S.W. was disciplined with a 30-day DAEP assignment by

DEFENDANT WHITE for fighting/mutual combat.  S.W.'s punishment here was in part due to the false charge that she previously violated the September 2023 stay away directive.

87.    On October 12, 2023, DEFENDANT WHITE sent PLAINTIFF WHITE an email wherein she attached what she claimed was "the same [stay away] directive I referenced in the letter I emailed to you on 9/15/2023."  She then wrote: "[The stay away directive] was verbally issued to [S.W.], but I added two more students to the list on 10/10/2023. Since I was out yesterday, I need to have a disciplinary meeting with you and/or Mrs. White to discuss the incident that occurred on campus on 10/11/2023….[S.W.] will remain in ISS until we can hold this meeting."

88.    The stay away directive DEFENDANT WHITE claims she verbally issued to S.W. indicates it was "issued verbally" was signed in October 2023 and has a duration of September 2023 to June 2023, none of which makes sense. See  Image No. 3 below.



**Image No. 3: Stay away directive DEFENDANT WHITE claims she issued to S.W.**

21

89. The stay away directive DEFENDANT WHITE claims she verbally issued to S.W. shows S.W. as the first student listed.

90. On October 13, 2023, a disciplinary meeting for S.W. proceeded, and DEFENDANT WHITE punished her with a 30-day discretionary DAEP placement. PLAINTIFF WHITE filed a Level I appeal the same day. Two days later, PLAINTIFF WHITE provided a copy of the cell phone video footage from the homecoming game but it was disregarded.

<u>S.W.'s DAEP Appeal Process at HJHS</u>

91. On October 17, 2023, S.W. began her 30-day DAEP punishment, reporting to a WISD facility miles away from her school.

92. On October 23, 2023, the HJHS principal heard PLAINTIFF WHITE's Level I appeal on behalf of S.W. During the Level I hearing, PLAINTIFF WHITE explained that S.W. was not subject to any stay away directive and that she was protecting herself from bullying and/or cyberbullying consistent with the Student Code. Further, PLAINTIFF WHITE alleged that DEFENDANT WHITE selectively disciplined S.W. The Level I hearing concluded without a decision or ruling on PLAINTIFF WHITE's Level I appeal.

93. By the time of the October 23 hearing on PLAINTIFF WHITE's Level I appeal, S.W. had already served six (6) days of the DAEP being challenged at the hearing.

94. On November 1, 2023, WISD denied PLAINTIFF WHITE's Level I appeal, finding that S.W. was not targeted or discriminated against in any way and, apparently, also finding that S.W. was subject to DEFENDANT WHITE's stay away directive from the investigation in which she determined that S.W. was bullied. PLAINTIFF WHITE's appeal was denied.

95. By the time of the denial of PLAINTIFF WHITE's Level I appeal, S.W. had already served fourteen (14) days of DAEP.

96.     On November 6, 2023, PLAINTIFF WHITE requested a Level II appeal, and his request was acknowledged by HJHS two days later.  By the time PLAINTIFF WHITE's Level II request, S.W. had already served twenty-one (21) days of DAEP.

97.     On November 12, 2023, while PLAINTIFF WHITE's Level II appeal request was pending, C.J. served her final day of DAEP, which had been reduced to 25 days.

98.     As a result of her DAEP punishment, S.W. was kicked off the HJHS volleyball team.

99.     On November 13, 2023, PLAINTIFF JEFFERSON and PLAINTIFF WHITE each spoke at a school board meeting and complained to DEFENDANT TRUSTEES about DEFENDANTS' unequal protection of C.J. and S.W. to no avail.

## A PATTERN AT WISD SCHOOLS OF UNEQUAL TREATMENT OF BLACK AND LATINO STUDENTS IN DISCRETIONARY DAEP ASSIGNMENTS

100.    There is a history at Texas public schools of racial discrimination in the implementation of student discipline.[21] Studies consistently find that youth of color, particularly African American youth, are disproportionately reported for disciplinary incidents and subjected to exclusionary punishments.[22] The harmful effects to Texas students occasioned by discretionary

---

[21] See Disciplinary Alternative Education Program Practices: Policy Research Report No. 17, August 2007; Division of Accountability Research, Department of Assessment, Accountability, and Data Quality; Texas Education Agency.

[22] U.S. Dep't of Ed. Office for Civil Rights, Civil Rights Data Collection: Data Snapshot (School Discipline), Issue Brief No. 1 (2014); General Accounting Office (2018) *K-12 Education: Discipline disparities for black students, boys, and students with disabilities* (GA018-258); Rocque & Paternoster, Understanding the Antecedents of the 'School-to-Jail' Link: The relationship between race and school discipline (2011) 101 The J. of Crim. L. & Criminology 633, 653-54.

school exclusions are disproportionately experienced by the state's Blacks and Latino students.[23]

See Graph No. 1 below.



**Graph No. 1:** DAEP Actions by Race/Ethnicity (2017-18) from Texas Appleseed
Publication: *Texas: The State of School Discipline, A Look at the Data 2017-18.*

101.    It has been demonstrated that when students are deprived instructional time for misbehavior—i.e., school exclusion—they can fall behind academically, and become less engaged in their school and their education.[24]

<u>DAEP in the State of Texas 2022-23</u>

102.    According to numbers for the 2022-23 school year provided by PEIMS, in State of Texas public schools, the rate of Black and Latino students removed from their classrooms and schools due to discretionary DAEP assignment was disproportionately high (red) when compared

---

[23]   https://www.texasappleseed.org/texas-state-school-discipline-look-data (DAEP Actions by Race/Ethnicity (2017-18) from Texas Appleseed Publication: *Texas: The State of School Discipline, A Look at the Data 2017-18*).
[24] Arcia, Emily, *Achievement and Enrollment Status of Suspended Students: Outcomes in a Large Multicultural School District* (May 1, 2006) 38 Educ. & Urb. Soc'y 359 (identifying a correlation between suspension and school avoidance, diminished educational engagement and decreased academic achievement).

with their percentage of overall students (yellow), with their White counterparts disproportionately low (green).[25]  See Chart No. 1 below.

| STUDENT GROUP | NUMBER OF STUDENTS | DAEP ACTIONS | DAEP STUDENTS |
|---|---|---|---|
| All students | 5,688,920 | 124,777 | 103,655 |
| Black students | 737,493 (12%) | 28,662 (21%) | 21,774 (21%) |
| Latino students | 3,011,621 (53%) | 70,349 (56%) | 58,566 (56%) |
| White students | 1,445,912 (25%) | 22,829 (18%) | 19,141 (18%) |
| All other students | 10% | 5% | 5% |

**Chart No. 1: TEA Counts of Students and Discipline Actions by Discipline Action Groups PEIMS 2022-23 Data State of Texas. See TEA WISD Discipline Statistics 2022-23, attached as Exhibit 3.**

103.    This means that in Texas a public school student is more likely to be removed from his or her classroom and schoolhouse via DAEP assignment if he or she is Black or Latino rather than White.

<u>DAEP in the WISD 2022-23</u>

104.    According to numbers for the 2022-23 school year provided by PEIMS, at WISD schools, the rate of Black and Latino students removed from their classrooms and schools due to discretionary DAEP assignment also was disproportionately high when compared to their percentage of overall students, with their White counterparts disproportionately low.  See Chart No. 2 below.

---

[25] The Public Education Information Management System (PEIMS) is a State of Texas database that encompasses all data requested and received by TEA about public education, including student demographic and academic performance, personnel, financial, and organizational information. PEIMS data is used by the State of Texas to analyze Texas public education data through data reports, evaluations, Texas Academic Performance Reports/Accountability ratings, and funding calculations.

| STUDENT GROUP | NUMBER OF STUDENTS | DAEP ACTIONS | DAEP STUDENTS |
|---|---|---|---|
| All students | 11,621 | 366 | 324 |
| Black students | 2,149 (18%) | 123 (32%) | 103 (32%) |
| Latino students | 4,072 (35%) | 139 (36%) | 116 (36%) |
| White students | 4,802 (41%) | 102 (26%) | 86 (27%) |
| All other students | 6% | 6% | 5% |

Chart No. 2: TEA Counts of Student Discipline Actions by Discipline Actions Groups PEIMS 2022-23 Data WISD.  See Ex. 1.

105.    Further, based on these statistics, Black and Latino WISD students actually suffer discrimination which is greater and more widespread than that experienced by their Black and Latino counterparts in the State of Texas generally.

106.    According to numbers for the 2022-23 school year provided by PEIMS, at WISD schools, the rate of Black and Latino students assigned to discretionary DAEP—versus mandatory DAEP assignment—also was disproportionately high when compared to that of their White counterparts.  See Chart No. 3 below.

| STUDENT GROUP | DISCRETIONARY DAEP PLACEMENT | MANDATORY DAEP PLACEMENT |
|---|---|---|
| All students | 113 | 273 |
| Black students | 40 (35%) | 83 (30%) |
| Latino students | 46 (40%) | 93 (34%) |
| White students | 22 (19%) | 80 (29%) |
| All other students | 6% | 7% |

Chart No. 4: TEA Counts of DAEP Placement Reason Types PEIMS 2022-23 Data WISD.  See TEA WISD DAEP Statistics 2022-23, attached as Exhibit 4.

107.    This means when WISD staff uses its subjective discretion, the likelihood for school exclusion in the form of DAEP increases for Black and Latino students.

108.    If discretion in the assignment of discretionary DAEP was reasonable, one would logically expect little-to-no variation between the racial percentages for mandatory versus discretionary DAEP assignment.   Put another way, when WISD is allowed discretion in the decision on whether to punish with school exclusion, the numbers increase for Black and Latino students assigned to DAEP, while the number for White students decreases.

109.    WISD's own data confirms these trends.  See WISD Discipline Data Report for October 2023, attached hereto as Exhibit 5.  According to this data, the rate of Black and Latino student placement in DAEP is disproportionately high when compared to their respective percentages of overall student enrollment.  See Chart Nos. 5 and 6 below.



Chart No. 5: Oct. 2023 WISD Enrollment by Ethnicity          Chart No. 6: Oct. 2023 WISD DAEP Placements by Ethnicity

110.    Similar to other measures of WISD discipline, these inflated percentages for Black students (+11.02%) and Latino students (+8.33%) are accompanied by a lower rate for White students (-19.38%).  See Ex. 5.

111.    Therefore, the discrimination suffered by C.J. and S.W. as described herein is not a single occurrence, or even two occurrences, but rather a reflection of a long-standing, vicious and pervasive custom of discrimination at WISD public schools, including WHS and HJHS.

## COUNT I
## Title VI of the Civil Rights Act
## 42  U.S.C. §2000d

112.     PLAINTIFFS re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

113.     PLAINTIFFS bring this cause of action pursuant to Title VI of the Civil Rights Act of 1964.  The statute provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in be denied the benefits of, or be subjected to discrimination under program or activity receiving Federal financial assistance.[26]

114.     "Title VI protects the right to be free from discrimination under a program that receives federal funding."  *Bryant v. School District No. I 38 of Garvin City, Oklahoma*, 334 F.3d 928, 931 (10th Cir. 2003).

115.     In light of Title VI, the Department of Education has promulgated regulations that prohibit policies that have a disparate impact on people of color, regardless of whether those policies are intentionally discriminatory.[27]

116.     In other words, the Department's regulations prohibit a recipient of federal funds from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin."[28]

---

[26] See 42 U.S.C. § 2000d.
[27] See *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 591-93 (1983).
[28] 34 C.F.R. § 100.3(b)(2).

117.    To make a successful claim for disparate impact under Title VI in the education setting, the complainant must show that the challenged acts have a disproportionate, discriminatory impact on a protected class.[29]

118.    Here, while WISD's policies and procedures may appear facially neutral in terms of race, DEFENDANTS' application of those same policies and procedures nonetheless had—and continues to have—a harmful and disproportionate discriminatory impact on C.J. and S.W., members of a protected class, as well as other Black and Latino WISD students.  DEFENDANTS have exploited their disciplinary discretion, using it as a weapon to discriminate against Black and Latino students based on their race.

119.    As a consequence of DEFENDANTS' acts and omissions, C.J. and S.W. have been deprived access to educational opportunities or benefits provided by WISD, in violation of 42 U.S.C. § 2000d, *et seq.*

120.    As a consequence of DEFENDANTS' acts and omissions, C.J. and S.W. have suffered—and will continue to suffer—a loss of educational opportunities, as well as other pecuniary and economic losses for which they are entitled to judgment.

121.    Therefore, DEFENDANTS are liable to PLAINTIFFS under Title VI of the Civil Rights Act.

**COUNT II**
**42 U.S.C. § 1983**
**Fourteenth Amendment—Denial of Equal Protection**

122.    PLAINTIFFS re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

---

[29] See *Georgia State Conf. of Branches of NAACP v. State of Ga.*, 775 F.2d 1403, 1417 (11th Cir. 1985); *Larry P. By Lucille P. v. Riles*, 793 F.2d 969, 982 (9th Cir. 1984).

123.    Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law. One such federal right is conferred by the Equal Protection Clause which prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."[30] Accordingly, to state a claim of racial discrimination under the Equal Protection Clause and Section 1983, the plaintiff must allege and prove that she received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.[31]

124.    To establish discriminatory intent, a plaintiff must show "that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group."[32]

125.    Here, C.J. and S.W.—victims of bullying and members of a protected class—were treated differently than the White students who bullied them, and this unequal treatment stemmed from DEFENDANTS' discriminatory intent.   At all relevant times, DEFENDANTS have intentionally singled out Black and Latino students, such as C.J. and S.W., for the purpose of adversely effecting those students.

126.    Moreover, once Black and Latino students are disproportionately funneled into DAEP, they find an appeal process that is meaningless and designed to frustrate any attempts at vindication, regardless of the underlying facts and defenses.

127.    DEFENDANTS' acts and omissions as alleged herein do not rationally further any legitimate state purpose or interest.

---

[30] See U.S. Const. amend. XIV, § 1.
[31] See *Priester v. Lowndes Cty.*, 354 F.3d 414, 424 (5th Cir. 2004).
[32] Id.

128.    DEFENDANTS, in denying C.J. and S.W. the equal protection of the laws, as required by the Fourteenth Amendment, have acted under color of law, making this cause of action enforceable pursuant to 42 U.S.C.S. § 1983.

129.    Due to the discriminatory treatment herein alleged, C.J. and S.W. have experienced mental anguish, embarrassment, as well as pecuniary damages, due to having to make up for the educational loss, in an amount to be proven at trial.  Furthermore, DEFENDANTS have subjected C.J. and S.W. to discriminatory treatment based on their race, which makes an award of punitive damages warranted.

130.    Such actions and decisions of DEFENDANTS have deprived C.J. and S.W. of the privileges and immunities secured by the Fourteenth Amendment.  Therefore, DEFENDANTS are liable to PLAINTIFFS under 42 U.S.C. § 1983.

### COUNT III
### *Monell* Custom of Discriminatory Discipline

131.    PLAINTIFFS re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

132.    A *Monell* "custom" is defined as a practice of government officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law.

133.    At all relevant times, over the course of many years, there existed an unconstitutional informal policy and/or unconstitutional *Monell* custom at WISD whereby Black and Latino students were disciplined more often and more harshly than White WISD students.

134.    The allowance of this pattern was the result of deliberate indifference to fact that WISD's official policies and/or customs were in violation of the Fourteenth Amendment and would naturally result in the violation of the constitutional rights of Black and Latino WISD students, including C.J. and S.W.

135.     The official policy and/or *Monell* "custom" described above was the moving force behind the violations of C.J. and S.W.'s constitutional rights and proximately caused their constitutional injuries.   The official policy and/or *Monell* "custom" described above also proximately caused a deprivation of the rights, privileges and immunities secured to  C.J. and S.W. by the Fourteenth Amendment, and laws enacted thereunder.

136.     At all relevant times, DEFENDANT TRUSTEES had final policy-making authority to create, adopt and implement WISD policies and/or customs, whether formal or informal.

137.     As a result of the official policies and/or customs described above, C.J. and S.W.'s Fourteenth Amendment rights were violated.   Therefore, DEFENDANT TRUSTEES are liable to PLAINTIFFS under 42 U.S.C. § 1983.

## COUNT IV
### Injunctive and Declaratory Relief

138.     PLAINTIFFS re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

139.     DEFENDANTS' acts and omissions pose on ongoing threat of irreparable harm to C.J. and S.W. and deprivation of their civil rights under Title VI of the Civil Rights Act, 42 U.S.C. §2000d, *et seq,* as well as a denial of equal protection under the Fourteenth Amendment.

140.     As a direct result of the actions and conduct of DEFENDANTS, C.J. and S.W. suffered and continue to suffer emotional distress, mental anguish and loss of educational opportunities.

141.     PLAINTIFFS ask this Court to declare that DEFENDANTS have perpetuated unconstitutional disciplinary custom harmful to Black and Latino WISD students.   Moreover, PLAINTIFFS seek a permanent injunction enjoining and restraining DEFENDANTS from any acts which perpetuate a policy, practice or custom of discriminatory treatment of C.J. and S.W.,

or which deprive them of their right to equal protection of the law under the Fourteenth Amendment.

WHEREFORE, PLAINTIFFS DEMAND:

1. That PLAINTIFFS be awarded compensatory damages against the DEFENDANTS under Counts I-III;

2. That the Court issue a permanent injunction enjoining and restraining DEFENDANTS, their agents, employees or administrators, and all those acting in concert with WISD, from engaging in further actions, policies, practices or customs which deprive C.J. and S.W. of educational opportunities or serve to deprive them of their statutory rights under Title VI of the Civil Rights Act, 42 U.S.C. §2000d, *et seq,* as well as a denial of equal protection under the Fourteenth Amendment of the U.S. Constitution;

3. That the Court order DEFENDANTS to purge C.J. and S.W.'s school file of any evidence of disciplinary measures enforced against them as a result of discriminatory conduct;

4. That fair and impartial jury of twelve (12) be empaneled to hear and try all issues properly submitted; and

5. That PLAINTIFFS be granted such further general relief as may be appropriate, including punitive damages, and attorney fees and costs as permitted under 42 USC§ 1988, *et seq.*

Respectfully submitted,

/s/ Walter P. Evans, IV
Texas State Bar No. 24002068
One of the Attorneys for PLAINTIFFS
EVANS/REILLEY
The Park at Eanes Creek
4407 Bee Caves Road, Suite 611
Austin, Texas 78746
Telephone: (512) 732-2727
Facsimile: (512) 732-2731
Email: chip@evenstxlaw.com

Tim Reilley

33

Texas State Bar No. 24002068
One of the Attorneys for PLAINTIFFS
EVANS/REILLEY
550 Reserve St., Suite 190
Southlake, Texas 76092
Telephone: (512) 732-2727
Facsimile: (512) 732-2731
Email: tim@evenstxlaw.com

and

Michael J. Laux
*N. Dist. Texas Admission Pending*
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFFS
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, Arkansas 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
mikelaux@icloud.com

# TEXAS EDUCATION AGENCY

## COUNTS OF STUDENTS AND DISCIPLINE ACTIONS BY DISCIPLINE ACTION GROUPS

### PEIMS 2022-2023 DATA

### District: WAXAHACHIE ISD 070912

### Charter Status: TRADITIONAL ISD/CSD

| STUDENT GROUP | NUMBER OF STUDENTS | ISS ACTIONS | ISS STUDENTS | ISS PERCENT | OSS ACTIONS | OSS STUDENTS | OSS PERCENT | DAEP ACTIONS | DAEP STUDENTS | DAEP PERCENT | JJAEP ACTIONS | JJAEP STUDENTS | JJAEP PERCENT | EXPUL ACTIONS | EXPUL STUDENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL STUDENTS | 11,621 | 3,692 | 1,450 | 12.48 | 465 | 237 | 2.04 | 366 | 324 | 2.79 | 19 | 18 | 0.15 | 0 | 0 |
| AMERICAN INDIAN OR ALASKA NAT | 64 | 14 | N/A | N/A | N/A | N/A | N/A | 0 | N/A | N/A | 0 | 0 | 0 | 0 | 0 |
| ASIAN | 80 | N/A | N/A | N/A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BLACK OR AFRICAN AMERICAN | 2,148 | 1,324 | 450 | 20.94 | 176 | 78 | 3.63 | 123 | 103 | 4.79 | N/A | N/A | N/A | 0 | 0 |
| HISPANIC/LATINO | 4,072 | 1,098 | 457 | 11.22 | 146 | 82 | 2.01 | 139 | 116 | 2.85 | N/A | N/A | N/A | 0 | 0 |
| NATIVE HAWAIIAN/OTHER PACIFIC | 22 | N/A | N/A | N/A | N/A | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | 0 | 0 |
| TWO OR MORE RACES | 432 | 157 | 53 | 12.27 | 22 | 10 | 2.31 | 20 | 17 | 3.94 | N/A | N/A | N/A | 0 | 0 |
| WHITE | 4,802 | 1,002 | 477 | 9.93 | 117 | 64 | 1.33 | 102 | 86 | 1.79 | N/A | N/A | N/A | 0 | 0 |
| FEMALE | 5,608 | 1,215 | 504 | 8.99 | 136 | 86 | 1.53 | 132 | 113 | 2.01 | N/A | N/A | N/A | 0 | 0 |
| MALE | 6,013 | 2,487 | 946 | 15.73 | 329 | 151 | 2.51 | 254 | 211 | 3.51 | N/A | N/A | N/A | 0 | 0 |
| SPECIAL ED. | 2,115 | 948 | 321 | 15.18 | 151 | 65 | 3.07 | 108 | 86 | 4.07 | N/A | N/A | N/A | 0 | 0 |
| ECON. DIS. | 6,057 | 2,676 | 956 | 15.78 | 377 | 179 | 2.96 | 297 | 245 | 4.04 | 16 | 15 | 0.25 | 0 | 0 |
| AT RISK | 5,438 | 2,798 | 1,007 | 18.52 | 384 | 181 | 3.33 | 318 | 259 | 4.76 | 14 | 13 | 0.24 | 0 | 0 |

N/A indicates counts or percentages are not available (i.e., masked) to comply with the Family Educational Rights and Privacy Act (FERPA). Masked numbers are typically small, although larger numbers may be masked to prevent imputation.

At risk counts are based on students who were enrolled in the fall of the school year.

Exhibit 1

STUDENT WELFARE                                                        FFH
FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION    (EXHIBIT)

# School-based Stay Away Agreement

The intent of this agreement is to increase safety for students who have been the target of severe or repeated bullying, sexual harassment or dating violence.  It is to be administered by the Principal or the Principal's designee in a conference with the offending student and his or her parent.

Name of Student:  _____

Date of most serious incident:  _____

Description of behaviors involved in incident-  _____

_____

_____

_____

_____

Date of assessment by Principal or designee-  _____

Date of Parent Notification:  _____

In order to protect the rights and safety of all members of our school community, you are required to stay away from _____ (name of targeted student) at all times during the school day and at any school-sponsored event.  This means that you may not approach, talk to, sit by or have any contact with (name of targeted student) at school or on school property, school busses and bus stops.

In addition, the following actions are effective immediately (list schedule changes, disciplinary and or restitution actions)

# Exhibit 2

Pflugerville ISD
227904

STUDENT WELFARE                                                                                  FFH
FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION          (EXHIBIT)

| Current Schedule | New Schedule |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Other Disciplinary Actions:

Violations of this agreement and acts of retaliation directly or indirectly toward the target or the target's friends or family members will be taken seriously and will result in further disciplinary actions.  Your compliance will be monitored by _____ (*Name and Title of School Staff*).

STUDENT WELFARE                                                                   FFH
FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION        (EXHIBIT)

Agreement is valid from_____(date) to_____(date).

This Agreement will be reviewed on_____(date).

Signatures

Student:_____Date:_____

Parent/Guardian:_____Date:_____

Administrator:_____Date:_____

cc:    Principal

       Assistant Principal

       Counselor

       SRO

STUDENT WELFARE                                                          FFH
FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION         (EXHIBIT)

## *Student-on-Student Altercation Response Chart*

All charges or reports of a student-on-student altercation (e.g., sexual harassment, harassment, bullying, inappropriate dating relationships) should be referred to the principal or the principal's designee. Principals are responsible for responding to incident reports. This checklist has been provided to assist the principal or designee in ensuring that necessary steps are taken when incidents have been brought to the principal's attention. To the greatest extent possible, confidentiality should be maintained when investigating reports.

| **Steps:** | **Date:** |
|---|---|
| 1.  Take necessary steps to separate alleged offender and target. | |
| 2.  Call SRO if appropriate.  If the altercation is assaultive in nature, see legal and policy guidelines for reporting and discipline, as well as CPS requirements. | |
| 3.  ALLEGED TARGET:  Conference with the alleged target outside of the presence of the accused student. Use every reasonable effort to protect the due process rights of the alleged offender. Contact parent/guardian.  The student may be accompanied by a parent/guardian or other representative.<br><br>a)  Assist the student in documenting the incident on a complaint form. If the student or parent declines to document the incident, note this on the complaint form. See FFH (Exhibit).<br><br>b)  Identify immediate actions that can be taken to increase the targeted student's safety and ability to participate in school without being subject to harassment. Refer the student to a school counselor as appropriate.<br><br>c)  Record your observations related to the student conference. | |
| 4.  ALLEGED OFFENDER:  Conference with the alleged offender out of the presence of the alleged target. Use every reasonable effort to protect the due process rights of the alleged offender. Contact parent/guardian.  The student may be accompanied by a parent/guardian or other representative.<br><br>a)  Allow the student an opportunity to respond in writing to the allegations.<br><br>b)  Refer the student to a school counselor as appropriate.<br><br>c)  Record your observations related to the student conference. | |
| 5.  Further investigate the complaint by interviewing any witnesses separately. Document findings. | |
| 6.  Communicate in a confidential manner with the SRO and counselor and principal or designee. | |
| 7.  Make determinations regarding alleged conduct, ordinarily within 5 (five) days. If extenuating circumstances delay the investigation, inform the alleged target or parent.  Record determination and actions, as follows (check box): | |

DATE ISSUED: 112/2010                                                    4 of 6

☐ Findings indicate that a student-on-student altercation occurred.

    a)  VICTIM:  Conference with the alleged victim and parent/guardian. Possible interventions:

- Identify actions to increase the targeted student's safety and ability to participate in school without fear or intimidation.
- Inform the student and parent of support services.
- Ensure the alleged victim has access to support when needed (e.g., administrator or counselor gives his/her business card to the student to carry and writes on the back:  *Please allow NAME to see me when requested.*)
- Inform the student of his or her right to request a "Stay Away Agreement." See FFH (Exhibit).
- Encourage the target to report further incidences.
- PSST Team referral if appropriate.
- Document conference and action plans.

    b)  OFFENDER:  Conference with the alleged offender and parent. Possible interventions:

- Emphasize expectations for positive behavior.
- Identify and implement disciplinary consequences and other actions that will be taken to prevent further incidences.
- Inform the student and parent of support services.
- Ensure the alleged offender has access to support when needed (e.g., administrator or counselor gives his/her business card to the student to carry and writes on the back:  *Please allow NAME to see me when requested.*)
- Address the seriousness of retaliation.
- If harassment was severe or repeated, a "Stay Away Agreement" may be issued. See FFH (Exhibit).
- Depending on the nature of the offense, disciplinary action may be warranted or mandated.
- Increase supervision of the offending student as appropriate.
- Behavior contract.
- PSST Team referral if appropriate.

    c)  REMINDER:  If there is a finding that the altercation involved physical or sexual assault or threats, notify the SRO immediately and follow legal and policy guidelines for reporting and discipline, as well as CPS requirements.

☐ Unable to determine that inappropriate behavior occurred, but there has been a determination that the situation justifies the communication of warnings, recommendations, and/or information regarding support services.

☐ There are no findings of inappropriate behavior.

Pflugerville ISD
227904

STUDENT WELFARE                                                          FFH
FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION        (EXHIBIT)

| | |
|---|---|
| 8.  After determination made:<br><br>• Give notice of the outcome to the parties – follow FERPA guidelines.<br><br>• Advise the parents and students that they may appeal the decision of the principal or designee regarding the outcome of the investigation into the allegation in accordance with FNG(LOCAL). | |
| 9.  If findings indicate that inappropriate behavior has occurred:<br><br>• Monitor the safety of the target<br><br>• Encourage the target to immediately communicate any safety concerns that may arise to an administrator or counselor or SRO.<br><br>• Document subsequent follow-up actions and complaints in the space provided on the complaint form. | |
| 10. Store complaint forms in a separate, confidential file. | |

# TEXAS EDUCATION AGENCY
## COUNTS OF STUDENTS AND DISCIPLINE ACTIONS BY DISCIPLINE ACTION GROUPS
### PEIMS 2022-2023 DATA

| STUDENT GROUP | NUMBER OF STUDENTS | ISS ACTIONS | ISS STUDENTS | ISS PERCENT | OSS ACTIONS | OSS STUDENTS | OSS PERCENT | DAEP ACTIONS | DAEP STUDENTS | DAEP PERCENT | JJAEP ACTIONS | JJAEP STUDENTS | JJAEP PERCENT | EXPUL ACTIONS | EXPUL STUDENTS | EXPUL PERCENT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL STUDENTS | 5,698,920 | 1,022,146 | 478,809 | 8.40 | 445,914 | 253,901 | 4.46 | 124,777 | 103,655 | 1.82 | 4,755 | 4,600 | 0.08 | 1,728 | 1,697 | 0.03 |
| AMERICAN INDIAN OR ALASKA NAT | 18,695 | 3,487 | 1,682 | 9.00 | 1,488 | 854 | 4.57 | 437 | 379 | 2.03 | NA | NA | NA | NA | NA | NA |
| ASIAN | 292,137 | 10,167 | 6,402 | 2.19 | 3,837 | 2,719 | 0.93 | 870 | 772 | 0.26 | 51 | 50 | 0.02 | 16 | 16 | 0.01 |
| BLACK OR AFRICAN AMERICAN | 737,493 | 250,517 | 104,697 | 14.19 | 137,739 | 70,707 | 9.60 | 26,862 | 21,774 | 2.95 | 851 | 822 | 0.11 | 409 | 396 | 0.05 |
| HISPANIC/LATINO | 3,011,621 | 509,213 | 242,665 | 8.06 | 228,322 | 134,111 | 4.45 | 70,349 | 58,596 | 1.94 | 2,956 | 2,856 | 0.09 | 1,033 | 1,019 | 0.03 |
| NATIVE HAWAIIAN/OTHER PACIFIC | 9,241 | 1,708 | 833 | 9.01 | 551 | 354 | 3.83 | 157 | 131 | 1.42 | NA | NA | NA | NA | NA | NA |
| TWO OR MORE RACES | 173,821 | 35,115 | 15,864 | 9.12 | 12,951 | 7,330 | 4.22 | 3,473 | 2,892 | 1.66 | 104 | 101 | 0.06 | 39 | 38 | 0.02 |
| WHITE | 1,445,912 | 211,939 | 106,706 | 7.38 | 61,046 | 37,766 | 2.61 | 22,629 | 19,141 | 1.32 | 787 | 747 | 0.05 | 218 | 217 | 0.02 |
| FEMALE | 2,775,277 | 329,316 | 165,119 | 5.95 | 152,889 | 91,975 | 3.31 | 44,079 | 37,625 | 1.36 | 1,348 | 1,316 | 0.05 | 561 | 548 | 0.02 |
| MALE | 2,913,643 | 692,830 | 313,690 | 10.77 | 293,025 | 161,926 | 5.56 | 80,698 | 66,030 | 2.27 | 3,407 | 3,284 | 0.11 | 1,165 | 1,149 | 0.04 |
| SPECIAL ED | 822,988 | 214,809 | 91,509 | 11.12 | 102,027 | 52,640 | 6.40 | 24,411 | 19,690 | 2.39 | 815 | 789 | 0.10 | 250 | 244 | 0.03 |
| ECON DIS. | 3,596,630 | 811,443 | 384,624 | 10.14 | 373,153 | 207,214 | 5.76 | 101,719 | 84,080 | 2.34 | 3,706 | 3,586 | 0.10 | 1,370 | 1,344 | 0.04 |
| AT RISK | 2,935,073 | 754,584 | 331,790 | 11.30 | 344,952 | 168,107 | 6.41 | 100,278 | 82,057 | 2.80 | 3,853 | 3,720 | 0.13 | 1,173 | 1,156 | 0.04 |

N/A indicates counts or percentages are not available (i.e., masked) to comply with the Family Educational Rights and Privacy Act (FERPA). Masked numbers are typically small, although larger numbers may be masked to prevent imputation.

At risk counts are based on students who were enrolled in the fall of the school year.

Exhibit 3

# *T E X A S  E D U C A T I O N  A G E N C Y*

## COUNTS OF DAEP AND JJAEP PLACEMENT REASON TYPES
### BY RACE/ETHNICITY AND GENDER

PEIMS 2022-2023 DATA

District: WAXAHACHIE ISD 070912

Charter Status: TRADITIONAL ISD/CSD

| STUDENT GROUP | DISCRETIONARY DAEP PLACEMENTS | MANDATORY DAEP PLACEMENTS | DISCRETIONARY JJAEP PLACEMENTS | MANDATORY JJAEP PLACEMENTS |
|---|---|---|---|---|
| ALL STUDENTS | 113 | 273 | N/A | N/A |
| AMERICAN INDIAN OR ALASKA NAT | N/A | 0 | 0 | N/A |
| BLACK OR AFRICAN AMERICAN | 40 | 83 | N/A | N/A |
| HISPANIC/LATINO | 46 | 83 | N/A | N/A |
| NATIVE HAWAIIAN/OTHER PACIFIC | 0 | N/A | 0 | N/A |
| TWO OR MORE RACES | N/A | N/A | N/A | 0 |
| WHITE | 22 | 80 | N/A | N/A |
| FEMALE | 39 | 83 | N/A | N/A |
| MALE | 74 | 180 | N/A | N/A |

N/A indicates counts or percentages are not available (i.e., masked) to comply with the Family Educational Rights and Privacy Act (FERPA). Masked numbers are typically small, although larger numbers may be masked to prevent imputation.

Exhibit 4

# Discipline Data for WISD (10/02/2023 – 10/31/2023)

The discipline breakdown for Waxahachie ISD for the month of __October__ shows discipline assignment trends for students in the district. While all categories of violations are represented in this report, specific categories of discipline infractions to note are: Conduct punishable as a felony **(02)**, Violation of Student Code of Conduct **(21)**, Assault against someone other than school employee/volunteer **(28)**, Fighting/Mutual Combat **(41)**, 5 Possessed, sold, gave, used, delivered, or was under the influence of marijuana or THC **(62)**, Possessed, sold, gave, delivered, or used e-cigarette **(63)**.

DAEP Placements **(57)**:

- **2** Conduct punishable as a felony **(02)** *Mandatory DAEP Placement*
- **13** Violation of Student Code of Conduct **(21)** *Discretionary DAEP Placement*
- **7** Marijuana or THC **(62)** *Mandatory DAEP Placement*
- **11** E-Cigarette/Vaping Device **(63)** *Mandatory DAEP Placement*
- **3** Assault against someone other than employee/volunteer **(28)** *Mandatory DAEP Placement*
- **19** Fighting/Mutual Combat **(41)**, *Discretionary DAEP Placement*

Expulsions (0):

ISS/OSS Placements:

- There were **287** ISS assignments (both full and partial days) for date window.  Some of these were multiple day assignments.
- There were **49** OSS assignments (both full and partial days) for date window.  Some of these were multiple day assignments.

Exhibit 5

Charting Discipline for WISD:



Enrollment % By Ethnicity (11,054 Total)

OSS Placements (49 Total) Ethnicity %

ISS Placements (287 Total) Ethnicity %

DAEP Placements (57 Total) Ethnicity %