IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LESLIE JEFFERSON, as Next Friend of C.J., a minor, and ANDREW WHITE, as Next Friend of S.W., a minor, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 3:24-cv-01904-E |
| WAXAHACHIE ISD BOARD OF TRUSTEES, *et al.*, | § § § | |
| Defendants. | § § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Leslie Jefferson, as Next Friend of C.J., a minor, and Andrew White, as Next Friend of S.W., a minor, bring this civil rights action against members of the Waxahachie Independent School District (WISD) Board of Trustees in their official capacities and three WISD employees (or former employees) in their individual capacities asserting claims under Title VI of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000d, and 42 U.S.C. § 1983, arising from alleged racially discriminatory disciplinary treatment of their daughters following alleged incidents of bullying. *See generally* Am. Compl. (ECF No. 13). The WISD Board Members and the individual Defendants filed separate motions to dismiss certain of Plaintiffs' claims under Federal Rule of Civil Procedure

1

12(b)(6).[1] As explained below, Plaintiffs cannot overcome the individual Defendants' entitlement to qualified immunity and Plaintiffs have failed to adequately plead the elements of a *Monell* claim. Accordingly, the District Judge should GRANT the individual Defendants' Motion to Dismiss (ECF No. 14) Plaintiffs' individual capacity § 1983 claims (Count II) as to Tonya Harris, Anthony Escoto, and Karina White, and GRANT the WISD Board Members' Motion to Dismiss (ECF No. 16) Plaintiff's *Monell* claim (Count III).

## Background

As relevant to the pending motions, this lawsuit arises from the following alleged facts.

1.  Alleged Facts Pertaining to C.J.

C.J. is African American. Am. Compl. ¶ 3. During the 2023–2024 school year, she was a sophomore at Waxahachie High School (WHS). *Id.* On September 18, 2023, C.J. was seated at a lunch table and approached by a student identified as "White female classmate" (WF1). *Id.* ¶ 44. WF1 told C.J. "to get up and leave the table because WF1 and her friends wanted the table." *Id.* ¶ 44. C.J. stayed at the table and WF1 left. *Id.* On September 22, 2023, C.J. was seated at the same lunch table with another classmate and approached by WF1, who "again demanded that C.J. vacate the lunch table but C.J. stayed seated." *Id.* ¶ 48. Then, WF1 "poured her beverage over C.J.'s head, on C.J.'s person and on the lunch table where C.J. sat,"

---

[1] Defendants do not move for dismissal of Plaintiffs' Title VI claims against WISD (Count I).

"C.J. threw water at WF1 and tried to create distance between the two of them," WF1 punched C.J. in the face, and a physical fight ensued. *Id.* ¶ 49–50.

Defendant Anthony Escoto, Vice Principal at WHS, disciplined C.J. by assigning her to in-school suspension (ISS) for five days. *Id.* ¶¶ 11, 51, 55. And "WF1 was either not disciplined or received lesser discipline than C.J." *Id.* ¶ 51.

On September 26, 2023, Vice Principal Escoto held a hearing on the September 22 cafeteria incident, determined that C.J. was not bullied and the incident was "properly characterized as a 'fight/mutual combat,'" and disciplined C.J. by assigning her to a discretionary DAEP[2] for 30 days. *Id.* ¶¶ 53–54.

C.J.'s mother filed a Level I appeal of this decision, and Defendant Tonya Harris, Principal at WHS, conducted the Level I hearing. *Id.* ¶ 55. C.J.'s mother learned there was video of the September 22 cafeteria incident that Principal Harris had not watched and Principal Harris never interviewed C.J.'s classmate who had been sitting at the same lunch table. *Id.* ¶¶ 10, 58. Principal Harris upheld C.J.'s ISS and discretionary DAEP assignments. *Id.* ¶ 59. C.J.'s mother further appealed the decisions and hearings related to these disciplinary actions, which

---

[2] According to Plaintiffs' Amended Complaint, a DAEP, or disciplinary alternative education program, "is a 'school exclusion' form of student discipline, meaning students assigned to DAEP are physically removed from their schools and excluded from the learning and studies transpiring in their classrooms." Am. Compl. ¶ 30. DAEP assignments may be mandatory or discretionary: "[m]andatory DAEP assignments result from conduct specified in [Texas Education Code] Chapter 37" including certain felonies and other serious crimes at a public school or on school property; by contrast, "[d]iscretionary DAEP assignments are determined by each district" and "result from alleged violations of the Student Code." *Id.* ¶¶ 32, 33.

were either denied or concluded without a decision or ruling. *Id.* ¶¶ 61–68. C.J.'s mother viewed WISD's video of the September 22 cafeteria incident, which "clearly reflects that WF1 started the incident by pouring her drink on C.J. and initiated physical contact by punching C.J." *Id.* ¶ 69.

C.J. completed her DAEP assignment—reduced to twenty-five days to account for her five days in ISS—on October 30, 2023 and returned to WHS on November 13, 202[3]. *Id.* ¶¶ 67, 70. The same day day, Plaintiffs spoke at a WISD school board meeting and complained to the Board of Trustees about Principal Harris and Vice Principal Escoto's "unequal protection" of C.J. *Id.* ¶ 99.

As a result of the DAEP assignment, C.J. was barred from trying out for the school cheerleading team. *Id.* ¶ 70.

2. Alleged Facts Pertaining to S.W.

S.W. is Latina. Am. Compl. ¶ 5. During the 2023–2024 school year, she was a sixth grader at Howard Jr. High School (HJHS). *Id.* ¶ 71. On September 6 and September 12, 2023, S.W.'s father informed Defendant Karina White, Assistant Principal at HJHS, that a student identified as "White female classmate" (WF2) "created and circulated a TikTok video in which the students call S.W. a 'whore,' among other things" and "continued to post derogatory social media messages about S.W." *Id.* ¶¶ 9, 72–73. On September 15, 2023, Assistant Principal White issued a report on the matter, "finding that S.W. was bullied and finding that the students' conduct [. . .] constituted 'bullying' in violation of WISD policy." *Id.* ¶ 74. Assistant Principal White advised S.W.'s father that "the offending students 'were

4

disciplined in accordance with the WISD student code of conduct and other necessary precautions [had] been put in place." *Id.* ¶ 74. Specifically, a stay away directive[3] was imposed on some of the students, including WF2, which required those students not make any contact with S.W. *Id.* ¶ 75–76. In September, Assistant Principal White's report did not "express that S.W. was subject to any stay away agreement," White herself did not "advise or mention that any type of stay away agreement would be imposed upon S.W.," and S.W.'s father did not receive a copy of any stay away directive for S.W. or attend any conference pertaining to a stay away directive. *Id.* ¶¶ 77–79.

On October 6, 2023, at a school homecoming game, "WF2 [. . .] aggressively approached and confronted S.W." *Id.* ¶¶ 80, 82. But on October 10, 2023, Assistant Principal White contacted S.W.'s father and advised him that "S.W. violated the stay away directive [] previously issued" when "S.W. put herself in the same area as some of the offending students . . . during [the game]." *Id.* ¶ 80. Plaintiffs allege that Assistant Principal White's "representation that [White's] stay away directive from [September] included S.W. was a false representation." *Id.* ¶ 81. Assistant Principal White told S.W.'s father that "S.W. would be disciplined with ISS for

---

[3] According to Plaintiffs' Amended Complaint, a "school-based stay agreement is a binding written agreement or directive whereby an offending student is required to stay away from a student he or she has targeted with bullying or other unwanted conduct. The intent of a stay away agreement is to increase safety for the targeted student." Am. Comp. ¶ 23. "Stay away agreements are to be administered by the school principal or designee in a conference with the offending student and his or her parent" and "are signed by the offending student and his or her parent." *Id.* ¶¶ 24, 26.

violating the September 2023 stay away directive." *Id.* ¶ 83. S.W.'s father requested a copy of the stay away directive and told Assistant Principal White about cell phone video footage that "supported S.W.'s account that she was simply watching the game . . . when she was aggressively approached and confronted by WF2." *Id.* ¶¶ 84–85.

On October 11, 2023, WF2 "taunted" S.W. during gym class and a physical altercation ensued. *Id.* ¶ 86. Assistant Principal White disciplined S.W. with a 30-day DAEP assignment for "fighting/mutual combat" and this punishment was "due in part to the false charge that she previously violated the September 2023 stay away directive." *Id.* The next day, Assistant Principal White sent S.W.'s father what she claimed was the September 2023 stay away directive, which noted that it was "verbally issued" to S.W. *Id.* ¶ 87. The stay away directive attached to Assistant Principal White's email was signed in October 2023, and has a duration of September 2023 to June 2023. *Id.* ¶ 88. On October 13, 2023, Assistant Principal White held a disciplinary meeting and disciplined S.W. with a 30-day DAEP placement, which S.W.'s father appealed. *Id.* ¶ 90. All subsequent appeals were either denied, concluded without a decision or ruling, or were still pending when S.W. completed her DAEP assignment. *Id.* ¶¶ 92–97.

S.W. completed her DAEP assignment—reduced to twenty-five days—on November 12, 2023. *Id.* ¶ 97. The next day, Plaintiffs spoke at a WISD school board meeting and complained to the Board Defendants about White's "unequal protection" of S.W. *Id.* ¶ 99.

6

As a result of the DAEP assignment, S.W. lost her spot on the school volleyball team. *Id.* ¶ 98.

### 3. Pattern of Unequal Treatment

Plaintiffs also allege that there is a "demonstrated pattern of unequal treatment of Black and Latino WISD students in Discretionary DAEP assignments." *Id.* ¶¶ 100–111.

According to Plaintiffs, "[t]here is a history at Texas public schools of racial discrimination in the implementation of student discipline." *Id.* ¶ 100. And, according to data provided to the Texas Education Agency (TEA), "a public school student is more likely to be removed from his or her classroom and schoolhouse via DAEP assignment if he or she is Black or Latino rather than White." *Id.* ¶ 103. This data also purportedly shows that "at WISD schools, the rate of Black and Latino students removed from their classrooms and schools due to discretionary DAEP assignment also was disproportionately high when compared to their percentage of overall students, with their White counterparts disproportionately low." *Id.* ¶ 104. Plaintiffs include a chart that represents 11,621 students enrolled in WISD in 2022–2023; and 41 percent of these students were White. *Id.* However, White students made up only 27 percent of the students in DAEP. *Id.* While Black students, who represent 18 percent of WISD students, made up 32 percent of the DAEP students; and Latino students, who represent 35 percent of WISD students, made up 36 percent of the DAEP students. *Id.* Plaintiffs assert that "[i]f discretion in the assignment of discretionary DAEP was reasonable, one would logically

expect little-to-no variation between the racial percentages for mandatory versus discretionary DAEP assignment." *Id.* ¶ 108. Thus, Plaintiffs conclude "[w]hen WISD staff uses its subjective discretion, the likelihood for school exclusion in the form of DAEP increases for Black and Latino students." *Id.* ¶ 107. And, "[t]herefore, the discrimination suffered by C.J. and S.W. . . . is not a single occurrence—or even two occurrences—but rather a reflection of a long-standing, vicious and pervasive custom of discrimination at WISD public schools." *Id.* ¶ 111.

    4. Procedural History

    Plaintiffs' live pleading—their Amended Complaint—asserts a Title VI claim against the WISD Board Members in their official capacities (Count I); a § 1983 claim against WHS Vice Principal Escoto, former WHS Principal Harris, and former HJHS Assistant Principal White (the "individual Defendants") (Count II); a *Monell* claim against the WISD Board of Trustees members (Count III); and claims for injunctive and declaratory relief against the WISD Board Members (Count IV). Am. Compl. ¶¶ 112–43.

    On November 11, 2024, the individual Defendants filed a motion to dismiss Plaintiffs' Complaint as to the § 1983 claims against each of them based on qualified immunity. Ind. Defs.' Mot. (ECF No. 14). The WISD Board Members filed a motion to partially dismiss Plaintiffs' Complaint against them, specifically as to the § 1983 claims (Count III). WISD's Mot. (ECF No. 16). Plaintiffs responded (ECF Nos. 19 and 28) and Defendants replied (ECF Nos. 29 and 30). The District Judge referred the motions to the undersigned for a recommendation and subsequently

granted the parties' joint motion to defer a ruling on the motions until after the parties' tentative resolution was presented to the WISD Board of Trustees for consideration on June 10, 2025. *See* ECF Nos. 33, 34, 36. On July 1, 2025, the parties notified the Court that they were not able to reach a resolution. *See* Notice (ECF No. 38). Accordingly, the motions are ripe for determination.

**Legal Standards**

To survive a Rule 12(b)(6) motion, a plaintiff's complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555).

This pleading standard does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Where the facts do not permit the Court to infer

more than the mere possibility of misconduct, the complaint has stopped short of showing that the plaintiff is plausibly entitled to relief. *Id.* at 678 (citing *Twombly*, 550 U.S. at 557).

When applying the plausibility standard, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations and citations omitted). But a court may not look beyond the pleadings. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Review is "limited to the complaint, any documents attached to the complaint, and any documents attached to the [motion to dismiss] that are central to the claim and referenced by the complaint." *Smith v. Buffalo Wild Wings*, 2021 WL 4265849, at *2 (N.D. Tex. Sept. 20, 2021) (citing *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)); *see also Inclusive Communities Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 399 F. Supp. 3d 657, 665 (N.D. Tex. 2019) ("In ruling on [a Rule 12(b)(6)] motion, the court cannot look beyond the pleadings.") (citing *Spivey*, 197 F.3d 772, 774 (5th Cir. 1999)), *aff'd*, 824 F. App'x 210 (5th Cir. 2020).

## Analysis

1. <u>Plaintiffs' § 1983 Claims as to the Individual Defendants (Count II)</u>

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (cleaned up) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir.

2008)). But a governmental employee sued under § 1983 may assert the affirmative defense of qualified immunity. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). "Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Blakely v. Andrade*, 360 F. Supp. 3d 453, 477 (N.D. Tex. 2019) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In other words, qualified immunity protects government officials when their actions "could reasonably have been believed to be legal." *Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011)). And "this immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Morgan*, 659 F.3d at 371).

"'State employment is generally sufficient to render the defendant a state actor,'" and a defendant necessarily "acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49–50 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n.18 (1982)). School district officials like the individual Defendants "enjoy qualified immunity 'unless [Plaintiffs] plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Brown v. Tarrant Cnty., Tex.*, 985 F.3d 489, 494 (5th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Further, courts

"have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.*

Here, the individual Defendants assert qualified immunity and argue that Plaintiffs' Amended Complaint does not plead facts sufficient to show violations of clearly established law to demonstrate a federal constitutional deprivation of Plaintiffs' equal protection rights. *See generally* Ind. Defs.' Br. (ECF No. 15).

To state a claim of racial discrimination under the Equal Protection Clause and § 1983, the plaintiff must allege that "[(1) he or she] received treatment different from that received by similarly situated individuals and that [(2)] the unequal treatment stemmed from a discriminatory intent." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (quoting *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004)) (internal quotations omitted). To demonstrate discriminatory intent, a plaintiff must establish "that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Id.* (citing *Priester*, 354 F.3d at 424) (internal quotations omitted). "Allegations of discriminatory intent that are merely conclusory, without reference to specific facts, will not suffice." *Id.* (quoting *Priester*, 354 F.3d at 420).

A. *Waxahachie High School Principal Tonya Harris and Vice Principal Anthony Escoto*

Plaintiffs fail to allege sufficient facts to overcome Principal Harris and Vice Principal Escoto's assertion of qualified immunity.

In their Amended Complaint, Plaintiffs allege that, after the September 22, 2023 cafeteria incident, Vice Principal Escoto disciplined C.J. with a 5-day ISS assignment, when "WF1 was either not disciplined or received lesser discipline than C.J." Am. Compl. ¶ 51. Escoto held a hearing on the incident, observed video of the incident and characterized it as a "fight/mutual combat," found "that C.J. was not bullied but instead engaged in aggressive behavior equally culpable with WF1," and further "punished C.J. with discretionary DAEP for 30 days." *Id.* ¶¶ 51, 53–54; Pls.' Resp. 9 (ECF No. 19). Plaintiffs argue that these factual allegations show Vice Principal Escoto's conduct constitutes intentional discrimination against C.J. based on her race. Pls.' Resp. 9.

As to Principal Harris, Plaintiffs allege that Principal Harris heard C.J.'s Level I appeal of Vice Principal Escoto's findings and DAEP punishment. Am. Compl. ¶ 55. Plaintiffs further allege that as part of the hearing, Principal Harris intentionally misstated State of Texas bullying criteria to C.J.'s mother, intentionally failed to interview witnesses to the two bullying incidents and did not question C.J.'s friend who was present and observed the alleged bullying, intentionally ignored video evidence depicting the September 22 incident, and intentionally upheld C.J.'s "harsh punishment despite knowing that the basis for that punishment was fraudulent." *Id.* ¶¶ 56–61; Pls.' Resp. 8. And Plaintiffs argue that these factual allegations show Principal Harris's conduct constitutes intentional discrimination against C.J. based on her race. Pls.' Resp. 9.

13

The individual Defendants argue that these factual allegations "do not speak in terms of equal protection or race" and Plaintiffs plead "no factual allegations supporting how [Principal Harris and Vice Principal Escoto] treated C.J. differently than similarly situated individuals, much less factual allegations reflecting intentional discrimination on the basis of race other than the single reference to the alleged bully being a white female." Ind. Defs.' Reply 3, 4 (ECF No. 29).

Viewing all well-pleaded allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Amended Complaint alleges that Principal Harris and Vice Principal Escoto treated C.J. differently than WF1, a similarly situated white student. *See* Am. Compl. ¶ 51. But this allegation is conclusory and fails to allege any specific facts with respect to WF1's treatment. Plaintiffs' Amended Complaint also fails to plead facts to show that the alleged different treatment stemmed from any racially discriminatory intent. *See, e.g., Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 623 (N.D. Tex. 2017) (plaintiff's allegation that the defendant principal was "aware of all of the facts that would inform a reasonable principal that there was no conduct meriting discipline" was "nothing more than [a] conclusory, speculative, and sweeping allegation[] of constitutional violation[] and intent" that was insufficient to overcome the principal's qualified immunity defense). Without specific facts to show that Principal Harris and Vice Principal Escoto singled out C.J. for disparate treatment

*because of her race*, Plaintiffs cannot overcome the administrators' entitlement to qualified immunity.

Plaintiffs' inclusion of statistics regarding racially discriminatory discipline in the State of Texas and WISD does not save their claim from dismissal. As alleged, the statistics are not specific to WHS and do not reflect any discretionary disciplinary decisions by Principal Harris or Vice Principal Escoto. *See Mohamed for A.M.*, 252 F. Supp. 3d at 624 (allegations that school district had a pattern of disciplining African-American students more harshly than other students were insufficient to impute liability to defendant principal; "[t]o overcome Principal Cummings's qualified immunity defense, Plaintiff must, at a minimum, allege facts from which the court may infer that Principal Cummings was himself personally motivated by discriminatory animus."). Accordingly, Principal Harris and Vice Principal Escoto are entitled to qualified immunity on Plaintiffs' § 1983 claims.

### B.   *Howard Junior High School Assistant Principal Karina White*

Similarly, Plaintiffs fail to allege sufficient facts to overcome Assistant Principal White's assertion of qualified immunity.

Plaintiffs allege that after Assistant Principal White concluded her investigation into the bullying of S.W. the month prior, she produced a backdated stay away directive as to S.W. and then claimed S.W. violated the stay away directive when she was approached by WF2 at a school homecoming game. Am. Compl. ¶¶ 80, 82. Plaintiffs allege that Assistant Principal White disciplined S.W. by assigning her to ISS. *Id.* ¶ 83. Plaintiffs allege that after a physical altercation

ensued between S.W. and WF2 during gym class, Assistant Principal White disciplined S.W. with a 30-day DAEP assignment, "in part due to the false charge that she previously violated the September 2023 stay away directive." *Id.* ¶ 86.

The individual Defendants argue that these factual allegations "do not speak in terms of equal protection or race" and Plaintiffs plead "no factual allegations supporting how Assistant Principal White treated S.W. differently than similarly situated individuals, much less factual allegations reflecting intentional discrimination on the basis of race. Ind. Defs.' Reply 2–3.

Plaintiffs' Amended Complaint fails to allege facts—even in the most conclusory manner—to show that Assistant Principal White treated S.W. differently than any similarly situated individuals. The Amended Complaint contains no factual allegations as to Assistant Principal White's discipline of WF2 after the homecoming game or the gym class altercation, or any other similarly situated student. It also fails to allege specific facts to show that White singled out S.W. for disparate treatment *because of her race*.

Again, Plaintiffs' inclusion of statistics regarding racially discriminatory discipline in the State of Texas and WISD does not save their claim. As alleged, the statistics are not specific to HJHS and do not reflect any discretionary disciplinary decisions by Assistant Principal White.

Accordingly, Assistant Principal White is entitled to qualified immunity on Plaintiffs' § 1983 claims.

16

2.  Plaintiffs' *Monell* Claim as to WISD (Count III)

The WISD Board Members move to dismiss Plaintiffs' § 1983 claims against them on the ground that Plaintiffs have failed to adequately plead the elements of a *Monell* claim. *See generally* WISD's Br. (ECF No. 17).

Plaintiffs' suit against the WISD Board Members, in their official capacities, is effectively a suit against WISD. *Jathanna v. Spring Branch Indep. Sch. Dist.*, 2012 WL 6096675, at *4 (S.D. Tex. Dec. 7, 2012); *see also Monell v. Dep't. of Social Servs. of the City of New York,* 436 U.S. 658, 690 n.55 (1978) (official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"). And WISD, like other school districts, is considered to be a local government unit or municipality subject to liability under § 1983. *See S.J. as Next Friend of N.J. v. Perryton Indep. Sch. Dist.*, 2024 WL 4906751, at *3 (N.D. Tex. Nov. 27, 2024) (citing *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) ("[S]chool districts are municipal entities under Section 1983.")). A municipality is a "person" subject to liability under § 1983 only if its employees inflicted the deprivation of a constitutional right pursuant to an official policy or custom. *Monell*, 436 U.S. 658, 690 (2018); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Isolated unconstitutional actions by municipal employees will almost never trigger municipal liability. *Piotrowski*, 237 F.3d at 578. And a school district "cannot be liable for civil rights violations under a theory of *respondeat superior* or vicarious liability." *Bailey v. Mansfield Indep. Sch. Dist.*, 425 F. Supp. 3d 696, 713 (N.D. Tex. Nov. 21, 2019)

(citing *Monell*, 436 U.S. at 691); *see also Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 380 (5th Cir. 2007) ("A school district has no vicarious liability under § 1983. Rather, it is liable for the unconstitutional conduct of its policymakers, including persons to whom it has delegated policymaking authority in certain areas."); *Baskin v. Parker*, 602 F.2d 1205, 1208 (5th Cir. 1979) (recognizing that "state vicarious liability doctrines are inapplicable in [section] 1983 suits.").

"To hold a school district liable under *Monell*, a plaintiff must plead facts that plausibly establish that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *S.J. as Next Friend of N.J.*, 2024 WL 4906751, at *2 (citing *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 760 (5th Cir. 2023)) (internal quotations omitted). "In Texas, the final policymaker for a school district is the Board of Trustees." *Sims v. Dallas Indep. Sch. Dist.*, 2024 WL 495259, at *2 (N.D. Tex. Feb. 7, 2024) (citing Tex. Educ. Code § 11.051; *Mohamed for A.M.*, 252 F. Supp. 3d at n.6).

Where a *Monell* claim fails as to one prong, the Court "need not consider whether [the] claim also fails the other two *Monell* prongs." *Brown*, 985 F.3d at 497 & n.11 (5th Cir. 2021); *see also Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168-69 (5th Cir. 2010) (court need not consider "moving force" prong because it found no "custom or policy" to link to the allegedly unconstitutional conduct).

### A. *Plaintiffs Fail to Allege an Underlying Constitutional Violation.*

The Court first addresses whether Plaintiffs have stated a claim for an underlying constitutional violation. *See Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (*Monell* claims are "contingent on a violation of constitutional rights."). Mirroring the individual Defendants' arguments, the WISD Board Members argue that Plaintiffs cannot establish a violation of C.J. and S.W.'s constitutional right to equal protection, as required to establish *Monell* liability. WISD's Br. 13–14.

As the Court addressed above, Plaintiffs have failed to plead a violation of C.J. and S.W.'s constitutional right to equal protection. As to C.J., Plaintiffs fail to allege any specific facts with respect to WF1—beyond the fact that Principal Harris and Vice Principal Escoto did not discipline her or that she received lesser discipline—and they fail to plead specific facts that show that the alleged disparate treatment stemmed from a racially discriminatory intent. *Supra* 14–15. And as to S.W., Plaintiffs fail to plead at all that Assistant Principal White treated S.W. differently than any similarly situated individuals and also fail to plead specific facts that show that any alleged disparate treatment stemmed from a racially discriminatory intent. *Supra* 15–16.

Also as addressed above, Plaintiffs' allegations of statistics regarding racially discriminatory discipline in the State of Texas and WISD, even taken as true, do not sufficiently plead any discretionary disciplinary decisions by Principal Harris, Vice Principal Escoto, or Assistant Principal White. *Supra* 15, 16.

19

Because Plaintiffs failed to plausibly allege a constitutional violation, they have also failed to plausibly allege a *Monell* claim.

To the extent Plaintiffs attempt to allege that a custom of racial discrimination in itself violated Black and Latino students' constitutionally protected rights, the Court addresses this argument below.

### B. Official Policy or Custom

Additionally, Plaintiffs fail to plead an official policy or custom of racial discrimination.

"The first element of *Monell* liability is that the [p]laintiff must allege facts sufficient to plausibly show the constitutional deprivation arose from an official policy or custom of the school district." *S.J. as Next Friend*, 2024 WL 4906751, at *3. "An official policy can be shown by (1) an explicit policy statement, ordinance, regulation, or decision officially adopted or promulgated; or (2) a custom that is the 'persistent, widespread practice' of the school district and is 'so common and well settled' that it 'fairly represents' school district policy. *Id.* (citing *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

"To be a custom, harms must come from more than just random acts or isolated incidents" and must instead come from a pattern of conduct. *Id.* (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)); *McConney v. City of Houston*, 863 F. 2d 1180, 1184 (5th Cir. 1989)); *see also Zarnow*, 614 F.3d at 169 (a "pattern of conduct" is necessary when the municipal actors are not policymakers). And "[a] pattern requires similarity and specificity; '[p]rior

indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)). "A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Id.* (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

"When a plaintiff has alleged liability based on an official policy, the plaintiff must show, among other things, either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences of constitutional violations." *Sims v. Dallas Indep. Sch. Dist.*, 2024 WL 495259, at *2 (N.D. Tex. Feb. 7, 2024) (quotations and citations omitted).

Plaintiffs do not allege an explicit policy statement, ordinance, regulation, or decision that shows an official policy of racial discrimination. Instead, Plaintiffs' Amended Complaint points to data from Texas public schools and WISD schools in 2022–2023 that purports to show a "demonstrated pattern of unequal treatment of Black and Latino WISD students in discretionary DAEP assignments." *See* Am. Compl. ¶¶ 100–11. Including charts from the TEA, Plaintiffs allege that:

- "the rate of Black and Latino students removed from their classrooms and schools due to discretionary DAEP assignment[s] [] was disproportionately high when compared

to their percentage of overall students, [and] with their White counterparts, disproportionately low." *Id.* ¶ 104.

- "the rate of Black and Latino students assigned to discretionary DAEP—versus mandatory DAEP assignment—also was disproportionately high when compared to that of their White counterparts." *Id.* ¶ 106.

Plaintiffs allege that this data shows that "when WISD uses its subjective discretion, the likelihood for school exclusion in the form of DAEP increases for Black and Latino students" and "the discrimination suffered by C.J. and S.W. [] is not a single occurrence—or even two occurrences—but rather a reflection of long-standing, vicious, and pervasive custom of discrimination at WISD public schools, including WHS and HJHS." *Id.* ¶¶ 107, 111.

The WISD Board Members argue that Plaintiffs' "mere recitation of disciplinary data from prior District reports is not enough to establish an actual policy or procedure" that caused the alleged constitutional violation. WISD's Br. 16–17. The Court agrees that Plaintiffs' statistical evidence is not sufficient to plead a custom or policy of racial discrimination on the part of WISD. It does not provide context for the Court to draw the reasonable inference that a custom of WISD administrators racially discriminated at the time of the disciplinary incidents giving rise to Plaintiffs' claims.

While plaintiffs may use statistical evidence to plead a custom or policy of racial discrimination, the Court is not satisfied that Plaintiffs have carried their burden here. In *Mohamed for A.M.*, Plaintiffs attempted to use student discipline statistics compiled by the TEA to allege a "pattern of discrimination" that "led

directly" to the "over-discipline" of the minor student. 252 F. Supp. 3d at 617. This Court held that the TEA report, among other allegations, was insufficient to plead evidence of a discriminatory policy or custom necessary for municipal liability under *Monell*. *Id.* Plaintiffs' allegations here fail for the same or similar reasons. Additionally, the general disciplinary statistics are presented without information on circumstances leading to the discipline, making it impossible for the Court to draw meaningful inferences of a policy simply from the state-wide and district-wide statistics. *Cf. Wright v. City of San Diego*, 2025 WL 1746305, at *2 (S.D. Cal. June 24, 2025) (explaining that "data and statistics created a plausible inference of support [for] a *Monell* failure to train claim at the motion to dismiss stage where the plaintiff [was] without discovery or retained experts" and allegations of a custom of policy "relied on statistical data that showed that the San Diego Police stopped Black people at the highest rates than any other group and Black San Diegans are stopped 4.2 times as often as White San Diegans.").

Because Plaintiffs' *Monell* claim fails to plead a custom or policy to link the allegedly unconstitutional conduct to, the Court need not consider the remaining *Monell* prongs.

## Recommendation

The District Judge should GRANT the individual Defendants' Motion to Dismiss (ECF No. 14) Plaintiffs' individual capacity § 1983 claims (Count II) as to Tonya Harris, Anthony Escoto, and Karina White, and GRANT WISD's Motion to Dismiss (ECF No. 16) Plaintiffs' *Monell* claim (Count III).

**SO RECOMMENDED**.

September 3, 2025.

_____
REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).